UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MICHAEL WILLIAMS                                       CIVIL ACTION

v.                                                     NO. 12-1274

DISTRICT ATTORNEY                                      SECTION "F"
PAUL CONNICK, JR., ET AL.

ORDER AND REASONS

Before the Court are two motions: (1) a motion for summary judgment by defendants Sheriff Newell Normand and former Detective Grey Thurman; and (2) the plaintiff's motion to set aside the magistrate judge's ruling denying his motion to compel discovery from Normand and Thurman.   For the reasons that follow, the defendants' motion is DENIED and the plaintiff's motion is GRANTED.

**Background**

This civil rights case arises out of a wrongful conviction in which a man charged with murder was tried, convicted, and sentenced to life in prison, where he served 15 years before his conviction was shown to be wrongful.

The facts of this case, as alleged by Michael Williams, are more completely set forth in this Court's February 28, 2013 Order and Reasons.   A summary of those facts most pertinent to resolution of the pending motions follows.

Michael Williams served over 15 years in prison for murdering Michelle Gallagher before Christopher Landry -- the only witness to testify to facts inculpating Williams -- recanted his testimony and admitted to lying to the grand jury and at trial to the judge during Williams' murder trial.  The State's case against Williams hinged on the testimony of Landry, a known crack addict, whose testimony, Mr. Williams alleges, was actively shaped by police and prosecutors in advance of trial; no physical evidence linked Williams to the crime.  In a recanting affidavit, Landry stated that he had lied because Detective Grey Thurman had threatened to charge Landry with the crime unless he inculpated Mr. Williams.

At 10:45 p.m. on March 6, 1996 Michelle Gallagher was discovered lying in the middle of the street just outside the Kennedy Heights subdivision.  She had been stabbed through her navel and died a short time after arriving at the hospital.  The Jefferson Parish Sheriff's Office and its lead investigator, Detective Grey Thurman, led the investigation.

For the first two weeks of the investigation, Detective Thurman had several leads to possible suspects, whom he ruled out. Soon thereafter, Detective Thurman received a tip that Christopher Landry, who lived in the Kennedy Heights neighborhood, had witnessed the murder.  (Landry was a habitual drug user, who had had run-ins with the law, including a drug conviction).  When Detective Thurman met with Landry, he told him that Landry would be

charged with murder if he did not give a statement saying that Michael Williams had murdered Michelle Gallagher.[1]

Landry, who became the State's key witness at Williams' trial, was the only State witness who claimed to have witnessed the crime.  Through Landry, the State presented the following theory of the murder: Landry witnessed Williams drive Gallagher around the Kennedy Heights neighborhood, argue with her, and then dump her body in the middle of River Road.  But the State failed to disclose the following pieces of exculpatory evidence that directly undercut the State's theory at trial:

a)   The first time Landry gave a recorded statement to Defendant Thurman, Landry did not claim Williams killed Gallagher. Detective Thurman failed to turn over this statement to the prosecution.[2]  During Williams' post-conviction proceedings, a microcassette containing this recorded statement was found in JPSO's files.  Neither the microcassette nor a transcription thereof appeared in JPDA's files.

b)   Landry made two additional statements prior to trial that were inconsistent with his trial testimony: a second statement made to Detective Thurman a few hours after Landry's first recorded statement, and testimony before the grand jury. The State did not disclose either statement to the defense.

c)   Landry only implicated Williams because he felt threatened. The State did not disclose documents and statements revealing that Landry was treated as a suspect during the investigation of Gallagher's murder.

d)   A witness named Lori Ramsey told police that she saw the victim hitchhiking more than a mile from Kennedy Heights, where Landry claimed to have seen her with Williams during the same time period. The State did not disclose this witness's statement to the defense.

---

[1]Detective Thurman denies coercing or threatening Landry.

[2]Detective Thurman disputes this fact; he says he made all evidence available to the prosecution.

e)   Detective Thurman had interviewed several other potential
     suspects before settling on Williams, including Haley Sapia
     and Earl Parker. Prior to interviewing Sapia and Parker,
     Detective Thurman had both suspects sign a "Rights of
     Arrestee or Suspects"form. Detective Thurman recorded the
     details surrounding the investigation of these suspects in
     his Supplemental Report. The State did not disclose the
     "Rights of Arrestee or Suspects" forms for Sapia or Parker
     to the defense, nor did it disclose Detective Thurman's
     Supplemental Report.

At trial in 1997, the State presented its theory, primarily
through Landry, that on the night of the murder, Williams drove
Gallagher around the Kennedy Heights neighborhood, they smoked
crack and argued, and then Williams stabbed Gallagher and dumped
her body along River Road outside of Kennedy Heights, where several
motorists saw her body.

One of the motorists who saw Gallagher lying in the street
was a newspaper deliveryman named Dewey Bruce; he testified that he
had first seen Gallagher outside the Waggaman subdivision, where
she had been staggering along the road.  After Bruce saw Gallagher,
he continued on his paper route through the Waggaman subdivision.
He encountered Gallagher again when he saw her lying in the street
just outside the Kennedy Heights subdivision, only 15 minutes later
and 2.5 miles from where he had just seen her.  The Jefferson
Parish District Attorney relied on Landry to fill in the missing
timeline in Bruce's testimony.  Landry offered this testimony:

a)   At approximately 10:30 on the night of Gallagher's murder,
     he saw Gallagher in the passenger seat of Williams' white
     Mustang as they drove by Landry in the Kennedy Heights
     neighborhood.
b)   Landry stole a bicycle from the yard of a nearby house and

4

  rode the bike to follow Williams and Gallagher. (Gallagher was thought to be a prostitute, and Landry followed Williams and Gallagher because he suspected that they were going to have sex and he wanted to watch.)

c) Landry followed the Mustang on the stolen bike across the Kennedy Heights subdivision to an abandoned lot approximately one mile away. Once there, he watched Williams and Gallagher smoke crack and then argue because Gallagher refused to have sex with Williams.

d) Williams then drove off with Gallagher, and Landry again followed on the stolen bike, taking more or less the same route as Williams. The car stopped on River Road shortly thereafter, and Landry watched as Williams exited the car, walked around to the passenger side door, opened it, dumped Gallagher's body to the ground on River Road, and then drove away.

The State, through then-Assistant District Attorney Ken Dohre, elicited testimony from Landry that his trial testimony was consistent with every account of the events that he had previously provided to the police.

  In closing argument, the State argued that Landry's testimony dovetailed with Bruce's testimony: everything Landry described could have taken place between the time Bruce saw Gallagher outside the Waggaman neighborhood and when he saw her body 15 minutes later outside Kennedy Heights. The State also emphasized that Landry's story had not changed since he first spoke to police, and that Landry had consistently described the route Williams took out of the Kennedy Heights neighborhood after arguing with Gallagher. The State argued that Landry had no reason to lie and in fact put himself at risk by testifying against Williams.

  After a five-minute recess following the State's rebuttal argument (in which the State re-emphasized Landry's consistent

description of the route taken by Williams), the judge agreed with the State and found Williams guilty of second-degree murder. Williams, then 31 years old, was sentenced to life without parole.

In fact, Landry had lied.

In February 2009 Landry gave a sworn affidavit stating that he gave false statements against Williams concerning the death of Michelle Gallagher to JPSO and the grand jury. He stated that he was offered a deal to receive a lesser sentence on a pending drug charge in exchange for testifying against Williams. Landry stated that JDPA told him that he (Landry) would serve a life sentence instead of Williams if he did not testify against Williams.

Several months later in September 2009, Landry provided another sworn affidavit to lawyers for the Innocence Project of New Orleans. He stated that his statements to police and in court about the death of Gallagher "was a lie." He "did not see Michael Williams in a car with Michelle Gallagher on the night she was killed," "did not get on a bike and follow them," "did not see them smoke crack," "did not see them get in an argument," and "did not see Michael Williams dump Michelle Gallagher's body from his car." Landry said that he "made up all of this." He stated that he was "high on crack" when the police showed up at his house to take him in for questioning. He stated that the police told him if he "did not give a statement saying that Michael Williams murdered Michelle Gallagher, they would charge [him] with the murder." Landry was

"scared" so he "told police what they wanted to hear."

After Landry recanted his testimony in 2009, IPNO discovered numerous pieces of evidence -- none of which had been disclosed to Williams or his defense counsel at trial -- that directly contradicted or undercut Landry's fabricated testimony at trial, as well as the State's argument that Landry adhered to a consistent story throughout the course of the State's investigation. The newly discovered evidence includes at least 10 statements from witnesses taken during the course of the investigation, including statements from Landry. Although Williams' trial counsel had requested notice "of the existence of any oral statements which the state has in its possession regarding the case, including information as to when, where, and to whom such oral statements were made," JPDA referred defense counsel only to Williams' transcribed statement to police. Williams' trial counsel had also requested "copies of audio or video recordings or written statements prepared or signed by every State witness," such as Landry.

At trial, Assistant District Attorney Dohre and the JPDA elicited testimony from Landry that they knew to be false: that Landry had not changed his story at any time since he first spoke to police. And, in closing argument, Dohre referred to Detective Thurman's testimony at trial to argue that Landry testified at trial to the same route he gave when he spoke to police only two

weeks after the murder.

Assistant District Attorney Dohre and the JPDA failed to provide the defense with transcribed exculpatory statements from other witnesses, including Lori Ramsey, Mark Shane Billiot, Philipe Billiot, Bruce Kelsey (two statements), Chad Chimento, Brenda Robinson, Gary Miller, and Earl Parker. Nor did Dohre and the JPDA provide the defense with evidence relating to other suspects that were considered during the JPSO's investigation, including the Rights of Arrestee or Suspects form signed by Haley Sapia, a witness who was with the victim on the night she was murdered, and the Rights of Arrestee or Suspects form signed by Earl Parker, a suspect JPSO investigated pursuant to an anonymous tip it received indicating that Parker was heard bragging about the murder. Even though information relating to the transcribed exculpatory statements from Lori Ramsey, Mark Shane Billiot, Philipe Billiot, Bruce Kelsey, Chad Chimento, Brenda Robinson, Gary Miller, and Earl Parker, as well as the Rights of Arrestee or Suspects forms signed by Haley Sapia and by Parker, was contained in the Supplemental Report of Detective Thurman, which Dohre and the JPDA had in their possession, they failed to disclose it to the defense.

In addition to withholding material exculpatory evidence from the defense, Williams alleges that the defendants actively manufactured evidence prior to trial and presented false and misleading evidence at trial to build a case around Landry's

8

testimony.    In his  noon  statement,  Landry  did  not  implicate
Williams in Gallagher's murder; he only told Detective Thurman that
the last time he saw Williams and Gallagher on the night of her
murder they were heading toward Avondale Garden Road and Gallagher
was  still  alive.    But  instead  of  transcribing  Landry's  noon
statement and providing it to the JPDA, Detective Thurman provided
the  JPDA a synopsis of  the  case describing an  interview  in which
Landry witnessed Williams remove Gallagher from her car and saw her
fall to the road.  By omitting critical facts from his synopsis,
Detective Thurman led JPDA to believe that there was a case against
Williams when, in fact, the entire case was premised on the false
testimony  of  Landry,  obtained  after  he  was  threatened  with
prosecution for Gallagher's murder.

Landry testified before the grand jury that Williams dropped
something out of his car but he had no idea what it was; but at
Williams'  trial,  Landry  testified  that  he  saw  Williams  drop
Gallagher's body to the ground.  During his 3 p.m. statement Landry
told Detective Thurman that he saw Williams dump Gallagher's body
on George Street.  Detective Thurman responded: "Is it possible
that he dumped her in the River Road and not on George St.?"
Landry agreed it could be possible and, at trial, Landry testified
that Williams dumped Gallgher's body on River Road (where her body
was actually found).  Williams alleges that Detective Thurman
manufactured evidence against Williams by feeding a critical fact

of the case to Landry, who actually had no first-hand knowledge of the murder.

Williams also alleges that the defendants manufactured evidence concerning Landry's bicycle route. The JPDA and JPSO had within their files a copy of Landry's 3 p.m. statement in which he claimed to have taken an implausible and circuitous route on his bike to follow Williams and Gallagher after they allegedly smoked crack and argued. IPNO obtained evidence from JPDA's files after Landry's recantation of his trial testimony that included three color-coded maps of the Kennedy Heights neighborhood. Williams alleges that these maps were created to coach Landry in his trial testimony because of concerns he would not stick to his story. Two of the color-coded maps show Landry's bicycle route as he explained it in the 3 p.m. statement while the third map shows the more direct route to which Landry testified at trial.

Williams also alleges that, to succeed in their efforts to manufacture evidence against Williams, Landry was threatened by the defendants. Landry has stated in a sworn affidavit that the police told him that if he "did not give a statement saying that Michael Williams murdered Michelle Gallagher, they would charge [him] with the murder." Landry also stated that the police brought his girlfriend in for questioning and he was "scared that the police were going to do something to her if I did not tell them what they wanted to hear." Landry also stated that he was informed by the

JPDA that if he did not testify against Williams at trial, he "would be the one serving a life sentence instead of Mr. Williams." Because he was scared, Landry said he agreed to testify against Williams. It is Williams' position that the district attorney defendants coached Landry's testimony to fit their theory of the case, including the timeline established by Bruce's two sightings of the victim the night she was murdered.

Thus, approximately 12 years after Williams' conviction, in 2009, Landry recanted his testimony against Williams; he admitted in two sworn affidavits that his testimony inculpating Williams was a complete fabrication, and that he had been coerced by the police and prosecutors to inculpate Williams. Landry stated that he testified against Williams because he was "scared" after the police and JPDA told him that he would be prosecuted for Gallagher's murder if he did not give a statement inculpating Williams and testify against him at trial.

Shortly after Landry's recantation, Williams filed a *pro se* application for post-conviction relief on the basis that the recantation exonerated him and he was entitled to a new trial. Williams, through counsel later learned that Detective Thurman, Assistant District Attorney Ken Dohre, the Jefferson Parish Sheriff's Office, and the Jefferson Parish District Attorney's Office had withheld multiple pieces of material exculpatory and impeachment evidence from Williams' trial counsel and manufactured

11

Landry's testimony.

On the basis of newly discovered evidence, Williams filed a second application for post-conviction relief with the assistance of Innocence Project New Orleans. On November 17, 2011 the district court for th 24th Judicial District granted a joint motion filed by JPDA and Williams to vacate the conviction. That same day, the JPDA dismissed the indictment against Williams. After spending more than 15 years in prison, Williams was released in 2011. It is Williams' position that his ordeal was no mistake; he claims that it was the result of a concerted bad faith effort by the police and district attorney, acting under color of state law, to cut out of whole cloth a case against Williams that had no factual basis, and to falsely convict him of murder in violation of his constitutional rights and rights under state law.

To seek redress for this unlawful conduct, on May 16, 2012 Williams sued Jefferson Parish District Attorney Paul Connick, Jr., in his official capacity; former Jefferson Parish District Attorney John Mamoulides, in his official capacity; Detective Grey Thurman, in his individual capacity; Sheriff Newell Normand, in his official capacity as Sheriff of the Jefferson Parish Sheriff's Office; the Jefferson Parish Sheriff's Office, the Jefferson Parish District Attorney's Office; former Jefferson Parish Assistant District Attorney Ken Dohre, in his individual capacity; and various unidentified parties. On September 11, 2012 Williams filed an

amended complaint.  He asserts various civil rights and state law claims against the defendants: a § 1983 claim against Detective Thurman for his wrongful suppression of <u>Brady</u> materials, and for concealing and manufacturing evidence which he says violated his right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, as well as articles of the state constitution, and various state law claims; a § 1983 claim against Assistant District Attorney Ken Dohre and unidentified Jefferson Parish District Attorney Office employees for failure to disclose exculpatory <u>Brady</u> materials and for evidence manufacturing, which he says violated his right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, as well as articles of the state constitution; a municipal liability claim under § 1983 against the Jefferson Parish District Attorney's Office, Paul Connick, Jr. and John Mamoulides, in their official capacities, for failure to train and for maintaining an unconstitutional custom and deliberate indifference with respect to the discharge of <u>Brady</u> obligations; a § 1983 against Sheriff Normand for the Jefferson Parish Sheriff's Office's maintenance of an unconstitutional policy and custom of failing to disclose exculpatory evidence and manufacturing evidence; various state law claims, including malicious prosecution and intentional/negligent infliction of emotional distress alleged against the Jefferson Parish District

Attorney's Office, Dohre, and unidentified parties, and a defamation claim asserted against Detective Thurman, Ken Dohre, and unidentified parties; and a direct action pursuant to La.R.S. § 22:1269(B) against unnamed insurance companies. Williams requests a jury trial and a judgment awarding him compensatory and punitive damages, as well as costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

Jefferson Parish District Attorney Paul Connick, Jr., former District Attorney John Mamoulides, the Jefferson Parish Attorney's Office, and former Assistant District Attorney Ken Dohre -- the Prosecutor Defendants -- requested dismissal of Williams' claims against them, invoking various theories of immunity and on the ground that Williams has failed to state a claim upon which relief may be granted. On February 28, 2013 the Court granted in part and denied in part the motion to dismiss, as follows: the defendants' request to dismiss the plaintiff's claims against the JPDA Office and former JPDA John Mamoulides was granted, JPDA Dohre's request to dismiss the claims against him on the ground of absolute prosecutorial immunity was granted; the defendants' request that the Court dismiss claims against them on the ground of sovereign immunity was denied, and Connick's request to dismiss the plaintiff's § 1983 claims against him in his official capacity on the theories of unconstitutional custom and failure-to-train was

also denied.[3]

Discovery in this case is ongoing.  Mr. Williams served discovery requests on the police defendants in May 2013.  The police defendants have obtained discovery from Mr. Williams, but have refused to meaningfully respond to Mr. Williams' discovery requests.  After private efforts failed, Mr. Williams filed a motion to compel on September 5, 2013.  When Magistrate Judge Knowles heard oral argument in October 2013, he asked whether Normand and Thurman intended to seek summary relief on the ground of qualified immunity; he stated that, if they filed such a request, he would stay their discovery obligations.[4]

Sheriff Normand and former Detective Thurman now seek summary relief, dismissing the plaintiff's civil rights claims against them.  The plaintiff opposes the defendants' motion for summary judgment, and also requests that this Court set aside the magistrate judge's ruling denying the plaintiff's motion to compel discovery from Normand and Thurman.[5]

_____

[3]Thus, in addition to the plaintiff's <u>Monell</u> claim against Connick, which survived the Prosecutor Defendants' motion to dismiss, his remaining claims include those not addressed by the Prosecutor Defendants' motion: Williams' claims against Detective Thurman and Sheriff Normand and his claims against various unidentified parties.

[4]Those defendants never submitted a request to stay their discovery obligations.

[5]This motion for summary relief was filed two days after argument before the magistrate judge.  Thereafter, Magistrate Judge Knowles denied the plaintiff's motion to compel discovery as to the

15

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with

police officer defendants, pending resolution of qualified immunity.

16

competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

II.
A.

Title 42, U.S.C. § 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law; it provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

To establish § 1983 liability, the plaintiff must satisfy three elements:

(1) deprivation of a right secured by the U.S. Constitution or federal law,
(2) that occurred under color of state law, and
(3) was caused by a state actor.

Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

17

*B.*

1.

When a plaintiff seeks money damages from government officials for alleged violations of constitutional or statutory rights, officials sued in their individual capacities may invoke the defense of qualified immunity. Because it is an immunity from suit and not a defense to liability, courts are advised to resolve the issue "at the earliest possible stage in litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)(per curiam).

"Qualified immunity shields government officials from civil damages liability," the U.S. Supreme Court has reiterated, "unless the official violated a statutory or constitutional right that was clearly established that the time of the challenged conduct." <u>Reichle v. Howards</u>, 132 S.Ct. 2088, 2093 (2012)(citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. ---, 131 S.Ct. 2074, 2080 (2011); <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)(This doctrine protects government officials against individual civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223

18

(2009)(noting that "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'").  In fact, "[q]ualified immunity represents the norm" and "is designed to shield from civil liability all but the plainly incompetent or those who violate the law." <u>Brady v. Fort Bend County</u>, 58 F.3d 173, 174 (5th Cir. 1995).

In resolving a government official's qualified immunity defense, courts have traditionally applied the two-prong process articulated in <u>Siegert v. Gilley</u>, 500 U.S. 226 (1991) and confirmed by the Supreme Court again in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001). First, the Court must determine whether the plaintiffs have shown a violation of a constitutional right.  <u>Id.</u> at 201.  The second inquiry requires the Court to consider "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009).[6]  Although

---

[6]In <u>Pearson</u>, the Supreme Court receded from <u>Saucier</u>, in determining that, while the sequence articulated in <u>Saucier</u> is often appropriate, it is no longer mandatory; accordingly, the Court may consider these inquiries in any sequence and need not even consider both.  <u>See</u> <u>Pearson</u>, 129 S.Ct. at 818-20 (reasoning that because the <u>Saucier</u> process sometimes unnecessarily "results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case...courts should have the discretion to decide whether that procedure is worthwhile in particular cases").

Step two of the qualified immunity analysis requires courts to determine whether the defendants' conduct "was objectively reasonable in light of clearly established law." <u>Thompson v. Upshur County, Tex.</u>, 245 F.3d 447, 457 (5th Cir. 2001)(citations omitted).  "Fair warning" is the touchstone of this

the Supreme Court has left to the district court's discretion the sequence for undertaking these two inquiries, the Supreme Court has increasingly indicated a preference for first considering whether a purported right was clearly established by prior case law "without resolving the often more difficult question whether the purported right exists at all." See Reichle, 132 S.Ct. at 2093 ("This approach comports with our usual reluctance to decide constitutional questions unnecessarily."); see also Camreta v. Greene, 563 U.S. ---, 131 S.Ct. 2020, 2031 (2011)(observing that "our usual adjudicatory rules suggest that a court *should* forbear resolving this issue")(emphasis in original); see also Pearson, 555 U.S. at 238-39 (listing circumstances in which courts might be best served to bypass the first step of the Saucier process, such as "when qualified immunity is asserted at the pleadings stage, the precise factual basis for the plaintiff's claim or claims [is] hard to identify").

In other words:  qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law,' so we do not deny immunity unless 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Morgan v. Swanson, 659 F.3d 359, 370-71 (5th Cir. 2011)(en banc)(internal

---

analysis.   Bush v. Strain, 513 F.3d 492, 501-02 (5th Cir. 2008)(citations omitted).   "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle, 132 S.Ct. at 2093 (quoting Camreta v. Greene, 563 U.S. ---, 131 S.Ct. 2020 (2011)).

quotations, citations, and footnotes omitted).   Once a defendant has invoked the defense of qualified immunity, the burden shifts to the plaintiff to show that the defense is unavailable.   <u>See</u> <u>Collier v. Montgomery</u>, 569 F.3d 214, 217-18 (5<u>th</u> Cir. 2009); <u>see also</u> <u>McClendon v. City of Columbia</u>, 305 F.3d 314, 323 (5<u>th</u> Cir. 2002)(<em>en banc</em>).   "Although qualified immunity is 'nominally an affirmative defense," the plaintiff bears a heightened pleading burden 'to negate the defense once properly raised.'"   <u>Newman v. Guedry</u>, 703 F.3d 757, 761 (5<u>th</u> Cir. 2012)(citing <u>Brumfield v. Hollins</u>, 551 F.3d 322, 326 (5<u>th</u> Cir. 2008)).   A plaintiff must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation.   <u>James v. Texas Collin Co.</u>, 535 F.3d 365, 373 (5<u>th</u> Cir. 2008).   And, "each individual defendant's entitlement to qualified immunity [should be examined] separately."   <u>Jacobs v. West Feliciana Sheriff's Dept.</u>, 228 F.3d 388, 395 (5<u>th</u> Cir. 2000)(citation omitted).

Former Detective Grey Thurman invokes the defense of qualified immunity in his summary judgment papers; he contends that he is entitled to immunity because no case extends the mandates of <u>Brady</u> to police officers and, assuming <u>Brady</u> applies, he complied with his obligation by producing the noon statement, or at least making it available to prosecutors.   He also seeks dismissal of the plaintiff's evidence-manufacturing and concealment claims on the

ground that such claims are not properly before the Court.  The plaintiff counters that Thurman is not shielded from liability at this stage because a genuine issue of material fact remains concerning whether Thurman's conduct violated Williams' constitutional rights and whether Thurman's actions were unreasonable in light of clearly established law.

Former Detective Thurman is entitled to qualified immunity on Williams' § 1983 claims concerning withholding of <u>Brady</u> evidence and concealing or manufacturing of evidence unless (1) Williams submits sufficient evidence to raise a genuine dispute as to a material fact suggesting that Thurman's conduct violated an actual constitutional right; and (2) Thurman's actions were objectively unreasonable in light of clearly established law at the time of the alleged misconduct.  Mindful of the contours of qualified immunity, the Court turns to the relevant constitutional rights Williams asserts Detective Thurman violated:  Thurman's failure to produce <u>Brady</u> evidence by withholding Landry's noon statement from prosecutors and Thurman's concealment and manufacturing of evidence in violation of the Due Process Clause.

(a) Due Process/<u>Brady</u> and the Noon Statement

Thurman submits his sworn affidavit to support his contention that he never withheld evidence from the district attorney's office; he submits that he produced Landry's noon statement, along

22

with the entire investigative file, to prosecutors.[7]   Williams
disputes this alleged fact, and points to evidence suggesting that
the noon statement was not turned over to prosecutors: Williams'
counsel discovered a recording of the noon statement only in the
JPSO's files, whereas there was no trace of the noon statement in
the JPDA's files; the noon statement was never transcribed, even
though JPSO had a practice of transcribing even immaterial witness
statements (noting that 21 other witness statements and Landry's 3
p.m. statement were transcribed and provided to prosecutors); other
evidence suggests that Thurman actively concealed the noon
statement from prosecutors (by misleadingly describing the 3 p.m.
statement as the only statement given by Landry that day) and
otherwise hinging the case only on Landry's 3 p.m. statement.

Notably, Williams is not the only party that disputes
Thurman's sworn statement that he turned over the noon statement to
prosecutors: District Attorney Paul Connick submits former
Assistant District Attorney Ken Dohre's sworn affidavit, in which
Dohre states that at the time he prosecuted the Williams case, he
was not aware of the noon statement.  He also submits that the JPDA
Williams case file contained a "Supplemental Report" prepared by
Detective Thurman, that the report was detailed and contained 21

---

[7]In subsequent papers, Thurman suggests that perhaps he
merely made available to prosecutors the noon statement, as opposed
to affirmatively producing it, but he suggests that the Court
should not get mired down in the semantics of whether he made the
statement available or physically delivered it to the prosecution.

witness statements, one of which is Landry's 3 p.m. statement, but that the report did not mention, let alone contain, a transcript or tape recording of any so-called noon statement taken by Detective Thurman of Landry.  Dohre states that he "was never aware of the existence of the so-called 'noon statement' until it was brought to my attention by...The Innocence Project...in 2011."

The Court is satisfied that a genuine dispute of material fact exists respecting whether or not Thurman failed to produce to prosecutors Landry's noon statement in violation of Thurman's duty under Brady.  Accordingly, the Court turns to consider whether the constitutional due process right (Brady) was clearly established at the time of the incident and, if so, whether Thurman's conduct was objectively unreasonable in light of that then clearly established law.

Citing a law review article, Thurman contends that "there is no case that expressly extends the mandates of Brady to the police officers as a blanket rule";[8]  he also invokes policy reasons for not extending Brady to police officers.  The Court disagrees.  As Williams points out, the Fifth Circuit has repeatedly held, before and after Thurman's conduct at issue here, that when a police officer conceals exculpatory evidence, he violates clearly established constitutional principles.  Accordingly, Thurman's

---

[8]See generally Michael Avery, Paying for Silence: The Liability of Police Officers under Section 1983 for Suppressing Exculpatory Evidence, 13 Temple Pol & Civil Rts. L. Rev. 1 (2003).

argument that he was not obligated by <u>Brady</u> and Due Process to produce to the prosecution evidence favorable to Williams must fail.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that an individual's constitutional right to a fair trial obligates the prosecution in a criminal case to turn over evidence to the defense in certain circumstances: "[u]nder <u>Brady</u>, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." <u>Smith v. Cain</u>, 132 S.Ct. 627, 630 (2012). Even though Detective Thurman does not now challenge whether Landry's noon statement constitutes <u>Brady</u> evidence, the Court finds it useful to summarize the somewhat analogous context presented by <u>Smith</u>:

Juan Smith was charged with killing five people during an armed robbery. <u>Id.</u> at 629. At his trial, a single eyewitness, Larry Boatner, linked Smith to the crime. <u>Id.</u> Boatner testified at trial that he was at a friend's house when Smith and two others entered the home, demanded money and drugs, and then began firing shots, killing five of Boatner's friends. <u>Id.</u> Also during trial, Boatner suggested that being face to face with Smith in the house facilitated his ability to identify Smith as the first gunman. <u>Id.</u> Smith was convicted of five counts of first-degree murder, a conviction that ultimately withstood appeal to the Louisiana

Supreme Court. _Id._

During Smith's state post-conviction proceedings, Smith obtained files from the police investigation of his case, including those of Detective John Ronquillo, the lead investigator. _Id._ Ronquillo's notes, which were not turned over to Smith for trial, contained statements by Boatner that conflicted with his testimony in identifying Smith as a perpetrator. _Id._ That is, the notes from the night of the murder state that Boatner "could not...supply a description of the perpetrators other then [sic] that they were black males." _Id._ In a handwritten account of a conversation he had with Boatner five days after the crime, Ronquillo noted that Boatner "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them." _Id._ at 629-30. Additionally, Ronquillo's typewritten report of that conversation states that Boatner told him that he "could not identify any of the perpetrators of the murder." _Id._ at 630.

The State of Louisiana did not dispute that Boatner's statements in Ronquillo's notes were favorable to Smith and that those statements were not disclosed to him. _Id._ Thus, the sole question before the U.S. Supreme Court was whether Boatner's statements were material to the determination of Smith's guilt. _Id._ The Supreme Court answered in the affirmative, reasoning that while "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in

26

the verdict...[t]hat is not the case here[, where] Boatner's
testimony was the only evidence linking Smith to the crime[; a]nd
Boatner's undisclosed statements directly contradict his
testimony." Id. (noting that, with respect to the State's argument
that Boatner also made statements on the night of the murder that
he could identify the first gunman, "[t]hat merely leaves us to
speculate about which of Boatner's contradictory declarations the
jury would have believed").

    There is no dispute that the State must turn over evidence
that is favorable to the defense and material to the defendant's
guilt.   But Thurman disputes, incorrectly, whether this
constitutional obligation applies to him as a police officer.   It
clearly does.   In 1988, in Geter v. Fortenberry, the Fifth Circuit
held that "a police officer cannot avail himself of a qualified
defense if he...deliberately conceals exculpatory evidence, for
such activity violates clearly established constitutional
principles."  849 F.2d 1550, 1559 (5th Cir. 1988) (Geter I).  Eleven
years later, the Fifth Circuit noted:

> We summarily reject Hale's alternative legal argument
> that the law was not "clearly established" because
> this court did not extend the Brady obligation to
> police officers until 1988, two years after Burge's
> first trial, in Geter v. Fortenberry, 849 F.2d 1550
> (5th Cir. 1988).  Twenty-one years before Geter, this
> court declared that suborning perjury and concealing
> exculpatory evidence by police officers were
> constitutional violations.  See Luna v. Beto, 391 F.2d
> 329, 332 (5th Cir. 1967).

Burge v. Parish of St. Tammany, 187 F.3d 452, 480 n.11 (5th Cir.

1999).[9]

---

[9]See also Hernandez v. Terrones, 397 Fed.Appx. 954, 971 (5th Cir. 2010)(unpublished, per curiam), in which the U.S. Court of Appeals for the Fifth Circuit observed:

> Defendants argue that in 1994, Brady did not extend to police officers. They cite Mowbray v. Cameron Cnty., 274 F.3d 269 (5th Cir. 2001), in support of their position. In Mowbray, officers failed to provide exculpatory evidence to the defendant's counsel. Although this Court observed that "our research reveals, no case extending Brady to police officers...," we also stated that "Mowbray does not allege, nor do the facts support a finding that [the officers] elicited false evidence and deliberately concealed exculpatory evidence from all parties, including the prosecution." Mowbray then cited Geter v. Fortenberry, 849 F.2d 1550 (5th Cir. 1988)(Geter I), which in turn cited Brady, and held "that a police officer cannot avail himself of a qualified immunity defense if he ... deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional rights." Geter, 849 F.2d at 1559. Based on the foregoing, it was clearly established law in 1994 that Brady applied to police officers on facts such as those presented in this case.

And, finally, see Bibbens v. City of Baton Rouge, 489 F. Supp. 2d 562, 573 (M.D. La. 2007):

> The court agrees with Bibbens...that his Brady claim-"withholding of evidence"-can survive summary judgment. The Fifth Circuit has repeatedly recognized the existence of a § 1983 cause of action for a police officer's suppression of material exculpatory evidence. Mowbray v. Cameron County, Tex., 274 F.3d 269, 278 (5th Cir. 2001); Sanders v. English, 950 F.2d 1152, 1162 (5th Cir. 1992)(finding a police officer's "deliberate failure to disclose ... patently exculpatory evidence to the prosecuting attorney's office plainly

Given these authorities, in 1996 and 1997 when Detective Thurman led the investigation into Michelle Gallagher's murder, it was clearly established that a police officer violates clearly established constitutional rights when he conceals exculpatory evidence, including when he fails to disclose such evidence to the prosecuting attorney's office. Because the plaintiff has identified a genuine dispute as to a material fact regarding whether Thurman failed to disclose a pre-trial witness statement (the noon statement), Thurman is not entitled to summary judgment on qualified immunity. See Burge, 187 F.3d at 479-80.

*(b) Due Process and Manufacturing/Concealing Evidence*

Detective Thuman next contends that Williams' claim that Thurman coerced Landry's pretrial statements in violation of the Fourteenth Amendment must fail. It is unclear whether Thurman attempts to invoke the defense of qualified immunity for the plaintiff's concealment and manufacturing of evidence claims. Even assuming he does, the plaintiff has established a genuine issue of material fact regarding Thurman's concealment and manufacturing of evidence, and Thurman had a clearly established constitutional duty to refrain from concealing and manufacturing evidence such that

---

exposes him to liability under § 1983"); Geter, 849 F.2d at 1559 (holding that a police officer is liable under § 1983 if he "deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles").

29

summary relief in his favor on these issues is inappropriate.[10]

In identifying a genuine dispute as to a material fact concerning whether Thurman violated Williams' due process right to be free from false or fabricated evidence, Williams contends that a genuine issue of material fact exists regarding whether Thurman coerced Landry into providing false testimony by threatening him. The Court finds that Williams has indeed identified a genuine dispute of material fact with respect to whether Thurman violated Williams' due process right to be free from false or fabricated evidence: on the one hand, Thurman submits his affidavit stating that he did not induce Landry to make any false statements; on the other hand, Landry's recanting affidavit contradicts Thurman's submission. Indeed, Landry stated that the police threatened to charge him with Gallagher's murder unless he inculpated Williams and that he was scared that the police would "do something" to his girlfriend if he did not tell them what they wanted to hear. This factual controversy precludes summary judgment to the extent Thurman seeks judgment as a matter of law on the issue of his immunity.

Moreover, there is no dispute as to whether manufacturing evidence violates a clearly established constitutional right. In

_____

[10]The Court does not pretend to recite and resolve any and all issues of alleged misconduct by Detective Thurman; it was his duty in presenting a summary judgment motion to seek specific relief. The Court merely resolves those issues fairly raised by the parties.

fact, manufacturing evidence is a clear violation of the Due
Process Clause. Castellano v. Fragozo, 352 F.3d 939, 955 (5th Cir.
2003)(en banc)("[A] state's manufacturing of evidence and knowing
use of that evidence along with perjured testimony to obtain a
wrongful conviction deprives a defendant of his long recognized
right to a fair trial secured by the Due Process Clause"); Good v.
Curtis, 601 F.3d 393, 401 (5th Cir. 2010)("[K]nowing efforts to
secure a false identification by fabricating evidence or otherwise
unlawfully influencing witnesses constitutes a violation of the due
process rights secured by the Fourteenth Amendment."); Young v.
Biggers, 938 F.2d 565, 570 (5th Cir. 1991). Here, there remains a
genuine factual dispute concerning whether Thurman coerced Landry
to lie; such presumptive conduct violated law that has been clearly
established since before Williams' underlying criminal trial: the
Fifth Circuit has recognized that "the right of criminal defendants
to be free from false or fabricated evidence was well settled by
1959 or earlier." Brown v. Miller, 519 F.3d 231, 237 (5th Cir.
2008). In short, if a factual controversy persists regarding
whether a police officer "fram[es] someone for a crime he did not
commit", see Young, 938 F.2d at 570 (internal quotations omitted),
the officer is not entitled to summary judgment on qualified
immunity.

However, with respect to Williams' second submitted factual
dispute concerning whether Thurman provided misleading testimony at

31

trial, the Court notes that Thurman appears to be shielded by a different sort of immunity: the absolute immunity of a trial witness sued under § 1983 -- an immunity that applies equally to police-officer witnesses.  See Rehberg v. Paulk, 132 S.Ct. 1497, 1505-07 (2012)(noting that the Supreme Court in Briscoe v. LaHue, 460 U.S. 325 (1983), in extending absolute immunity to police officer witnesses, "rebuffed two arguments for distinguishing between law enforcement witnesses and lay witnesses for immunity purposes").[11]

### 2.

Of course "municipalities have no immunity from damages liability flowing from their constitutional violations." Owen v. City of Independence, 445 U.S. 622, 657 (1980).  Municipalities are "persons" within the meaning of § 1983 and may be liable under this section if the governmental body itself subjects a person to, or

---

[11]Thurman makes no argument on this point.  Thurman's false testimony at trial is simply an argument that the plaintiff raised in opposition to Thurman's suggestion that any argument that Landry's pretrial statements were coerced "is not before the Court."

In the event the Court was inclined to grant Thurman's motion, Williams alternatively requests discovery pursuant to Federal Rule of Civil Procedure 56(d) to examine the circumstances of the noon statement, its preservation, why the statement was not transcribed like the 3 p.m. statement.  The Court finds that, even if material facts did not preclude summary judgment on the qualified immunity defense, the plaintiff has demonstrated entitlement to discovery pursuant to his amply-supported Rule 56(d) request.

causes a person to be subjected to, a deprivation of rights.
Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).  "[A]
local government may not be sued under § 1983 for an injury
inflicted solely by its employees or agents.  Instead, it is when
execution of a government's policy or custom ... inflicts the
injury that the government as an entity is responsible under §
1983." Id. at 694.

     The Fifth Circuit has held that a suit against a sheriff in
his official capacity is a suit against the Parish in which he
sits.  See Jacobs v. W. Feliciana Sheriff's Dep't, 228 F.3d 388,
392 (5th Cir. 2000); see also Corley v. Prator, 290 Fed.Appx. 749,
752 (5th Cir. Aug. 25, 2008)(suit against sheriff in his official
capacity "must be treated as suit against the municipality").
Thus, the plaintiff's official capacity claim against Sheriff
Normand is treated as a suit against Jefferson Parish.[12]  Sheriff
Normand makes but one argument in support of his request for
summary relief on the plaintiff's Monell claim against Jefferson
Parish:  in a footnote, Normand contends that Williams "has wholly
failed to allege or show an underlying constitutional violation."
Curiously, he does not elaborate or invoke any case literature that

_____

     [12]The plaintiff's allegations concerning the
unconstitutional policy, custom, or practice and deliberate
indifference with respect to the discharge of Jefferson Parish's
Brady obligations and obligations to refrain from manufacturing
evidence are contained in paragraphs 144 through 152 of the
plaintiff's amended complaint.

might support the conclusory argument he advances.  Quite clearly, this falls short of carrying the summary judgment burden.

III.

Pursuant to Rule 72(a) and 28 U.S.C. § 636(b)(1)(A), Williams requests that the Court set aside Magistrate Judge Knowles' October 30, 2013 Order, in which he denied the plaintiff's motion to compel discovery from Grey Thurman and Newell Normand pending resolution fo their motion for summary judgment.

A magistrate judge is afforded broad discretion in the resolution of non-dispositive motions.  See Fed.R.Civ.P. 72(a); see also 28 U.S.C. § 636(b)(1)(A).  If a party objects to a magistrate judge's ruling on a non-dispositive matter, the Court will disturb a magistrate's ruling only when the ruling is " clearly erroneous or is contrary to law."  See Fed.R.Civ.P. 72(a); see also Castillo v. Frank, 70 F.3d 382, 385 (5th Cir. 1995); Perles v. Kagy, 394 F. Supp. 2d 68, 70 n.6  (D. D.C. 2005) (agreeing with other district courts' application of clearly erroneous standard to magistrate judge's denial of a motion to intervene).

Magistrate Judge Knowles denied the plaintiff's motion to compel discovery from Grey Thurman and Newell Normand pending resolution of their motion for summary judgment.  In light of the fact that this Court has now resolved the defendants' motion for summary judgment, it appears that the plaintiff's request that the Court set aside the order denying the motion to compel pending

34

resolution of the motion for summary judgment is now moot. Nevertheless, the Court considers the merits of the plaintiff's motion.

First, Williams contends that because Sheriff Normand cannot assert the defense of qualified immunity, there was no basis to stay discovery against him.  The Court agrees and finds that the magistrate judge's ruling as to discovery directed toward Normand was clearly erroneous.  Because, as noted above, qualified immunity does not extend to state officials sued in their official capacities, Williams was and is entitled to conduct discovery to pursue his <u>Monell</u> claim against Normand and Jefferson Parish.

Second, Williams contends that Detective Thurman's assertion of qualified immunity turns on contested factual issues and that Williams is entitled to discovery at least on these factual issues. Again, the Court agrees.  However, because the Court has resolved Thurman's request for qualified immunity in favor the plaintiff, the summary judgment motion is no longer pending and there is no longer any impediment to a ruling by Magistrate Judge Knowles on the issue of the plaintiff's motion to compel discovery from Detective Thurman.

Accordingly, IT IS ORDERED: that the defendants' motion for summary judgment is DENIED. With respect to the plaintiff's motion to set aside the magistrate judge's order denying his motion to compel discovery, to the extent that the request is not moot, IT IS

ORDERED: that the motion is GRANTED.

New Orleans, Louisiana, January 15, 2014

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE